IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DANIEL MIERA,

       Plaintiff,

v.                                                                No.  14-CV-306 GBW/KK

GERALD A. MARTIN, LTD,
AND VICTORIA MARTIN,

       Defendants,

## ORDER DENYING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

      This matter comes before the Court on Defendants' Motion for Summary

Judgment and accompanying Memorandum.  *Docs. 50, 51.*  Having reviewed the

motion, the attendant briefing, *docs. 55, 57*, and the relevant law, and being otherwise

fully advised, the Court will DENY Defendants' motion.

## I.    BACKGROUND

      This case concerns Plaintiff's termination from his employment with Defendant

Gerald A. Martin, Ltd. ("GM").  At all times material to Plaintiff's claims, Defendant

Victoria Martin ("Martin") was serving as President and Chief Executive Officer of GM.

*Doc. 1*, Ex. B ¶ 4.

      Plaintiff began working at GM in Albuquerque, New Mexico, in October 2011, in

the position of Risk Manager.  *Doc. 1*, Ex. B ¶¶ 2, 6.  Plaintiff was promoted twice

throughout his tenure with the company, ultimately serving as the Vice President of

1

Business Administration from May 2013 until his termination on December 11, 2013. *Doc. 1*, Ex. B ¶ 7.

In late November or early December 2013, Plaintiff's wife began to have medical complications associated with her second pregnancy. *Doc. 1*, Ex. B ¶ 9. Plaintiff alleges that he informed Defendants Martin and GM that he would need to take Family and Medical Leave Act (FMLA) leave to attend to his wife's condition. *Doc. 1*, Ex. B ¶ 10. Plaintiff claims GM never provided him with any FMLA paperwork. *Doc. 1*, Ex. B ¶ 11.

When notified of Plaintiff's intentions, Defendant Martin expressed her displeasure with Plaintiff's need to take time off work. According to Plaintiff, she told him that he "should not have to attend to his wife's or unborn baby's concerns because there were other family members who could take care of those matters, and . . . he should focus only on work because without his job . . . he would have bigger problems." *Doc. 1*, Ex. B ¶ 12. Plaintiff alleges that Defendant Martin also made the following comment[1]:

> [T]imes sure have changed since I had children, and men have changed too. When I was pregnant with the boys, my husband went to work and I took myself to the hospital, and brought myself home from the hospital after having the babies. My husband would come home and say "wow, you had the baby" and then he'd be right back at work the next morning. Men and women were stronger back then . . . the men always worked and the women took care of themselves, the children and the home, regardless of whether they were pregnant.

---

[1] Plaintiff concedes that this may not be a verbatim rendition of Defendant Martin's words, but maintains that her statement was to this effect. *Doc. 1*, Ex. B ¶ 13.

*Doc. 1*, Ex. B ¶ 13.

Due to his wife's condition, Plaintiff left work at around 5:00 p.m. on Friday, December 6, 2013, and missed one hour of work on the morning of Monday, December 9, 2013. *Doc. 1*, Ex. B ¶ 14. These absences did not affect Plaintiff's pay or the total number of hours he worked. *Id.* Plaintiff learned that Defendant Martin was not pleased with him for missing work, and he attempted to meet with her on December 10, 2013, to discuss his continuing need for intermittent leave. *Doc. 1*, Ex. B ¶ 15-16. Plaintiff met with Defendant Martin on the morning on December 11, 2013. *Doc. 1*, Ex. B ¶ 17. He informed her that he would need intermittent FMLA leave until his child was born, and newborn leave thereafter. *Doc. 1*, Ex. B ¶ 18. He advised her that he would submit a formal request for FMLA leave in writing as well. *Doc. 1*, Ex. B ¶ 19. Plaintiff submitted a written request for FMLA leave to Don Francisco Trujillo, GM's Human Resources Manager, at approximately 11:45 a.m. that same day. *Doc. 1*, Ex. B ¶ 20. At around 4:45 p.m. that afternoon, Defendant Martin called Plaintiff into a meeting where Mr. Trujillo was present. *Doc. 1*, Ex. B ¶ 21. Defendant Martin informed Plaintiff that he was being terminated, effective immediately, due to a reduction in force. *Doc. 1*, Ex. B ¶ 22.

Plaintiff brings the following causes of action against Defendants: (1) interference under the Family and Medical Leave Act (FMLA), (2) retaliation under the FMLA, and

(3) retaliatory discharge under New Mexico law.  *See generally doc. 1*, Ex. B.  Defendants

move for summary judgment on each of Plaintiff's claims.  *Docs. 50, 51*.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires that a party seeking summary

judgment demonstrate that "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he moving

party carries the burden of showing beyond a reasonable doubt that it is entitled to

summary judgment."  *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir.

2002) (quoting *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991)) (internal

quotations omitted).

Summary judgment is proper only if a reasonable trier of fact could not return a

verdict for the nonmoving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The

movant bears the initial burden of "show[ing] that there is an absence of evidence to

support the nonmoving party's case."  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d

887, 891 (10th Cir. 1991) (citing *Celotex*, 477 U.S. at 323).  Once the movant meets this

burden, Rule 56(e) requires the non-moving party to designate specific facts showing

that "there are . . . genuine factual issues that properly can be resolved only by a finder

of fact because they may reasonably be resolved in favor of either party."  *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex*, 477 U.S. at 324.  "An issue is

'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.  An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A).  All material facts set forth in the motion and response which are not specifically controverted are deemed undisputed.  D.N.M.LR-Civ. 56.1(b).

The court must adhere to three principles when evaluating a motion for summary judgment.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  *See Liberty Lobby*, 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  *See Hunt v. Cromartie*, 526 U.S. 541, 551–54 (1999).  Third, the court cannot decide any issues of credibility.  *See Liberty Lobby*, 477 U.S. at 255.  However, if the non-moving party's story "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  In the end, "to survive the . . . motion, [the non-movant]

need only present evidence from which a jury might return a verdict in his favor." *Id*. at 257.

### III.   UNDISPUTED FACTS

1.   Plaintiff began working at GM on October 11, 2011, in the position of Risk Manager.  *Doc. 51* at 1, ¶ 1.  He was hired by Defendant Victoria Martin, who was the President and CEO of GM.  *Id.*

2.   Plaintiff was promoted to Director of Business Administration in June 2012.  *Doc. 51* at 1, ¶ 2.

3.   On February 26, 2013, Plaintiff sent a letter to Defendant Martin.  *Doc. 51* at 3, ¶ 13; *doc. 55* at 2-3, ¶ 13.  The letter requested that Defendant Martin and Plaintiff set aside a time to meet and communicate about a work issue.  *Doc. 51*, Ex. A-12.

4.   Plaintiff's letter stated in part that "it appears you want minimal-to-no interaction with me," and asked for "a chance at resolution."  *Id.*  Specifically, the letter suggested discussing: "1) What can Daniel [Miera] learn from this situation to improve for the future – what could he have done differently to produce a different or better outcome?; and 2) Can we put this behind us and move forward – do you still want me to be a member of your team?"  *Id.*[2]

---

[2] Plaintiff argues that this letter was not meant to address Defendant Martin's dissatisfaction with his work performance so much as her displeasure with "a situation [at work] where we had a protest that went forward on a project to gain a certain outcome . . . [a]nd Victoria was very angry that it didn't work out the way that she planned . . . ."  *Doc. 51*, Ex. A at 88:6-16.  Plaintiff stated that "[t]he outcome was out

5.  In May or June 2013, Plaintiff became the Vice President of Business Administration.  *Doc. 51* at 1, ¶ 2; *doc. 55* at 1, ¶ 2.  He assumed additional responsibilities in this role.  *Id.*

6.  At some point in the summer of 2013, GM personnel began working on the budget for the October 2013–September 2014 fiscal year.  *Doc. 51* at 3, ¶¶ 14-15; *doc. 55* at 3-4, ¶¶ 14-15.  Plaintiff, Defendant Martin, and Keri Adrian Williams, GM's Director of Finance, held meetings to discuss reducing costs and overhead. *Id.*

7.  Ms. Williams generated "Recommendations to Reduce Current GM Overhead" in late October or early November 2013.  *Id.*  The Recommendations did not specifically include a recommendation to terminate Plaintiff or to eliminate his position.  *Doc. 55* at 3-4 ¶ 15-16.

8.  Multiple emails with draft budgets were circulated in November and December 2013 among Plaintiff, Defendant Martin, and Ms. Williams.  *Doc. 51* at 4, ¶ 17; *doc. 55* at 4-5, ¶ 17.  GM needed to improve its position and eliminate unnecessary expenses.  *Doc. 51* at 4, ¶ 19; *doc. 55* at 5, ¶ 19.

9.  In November and December 2013, Plaintiff managed his work schedule so that he could take time to assist his wife with her prenatal medical complications. *Doc. 55* at 5, ¶¶ 20-21.

---

of my control."  *Id.* at 89:21.  However, Plaintiff does not dispute that he did in fact send this letter to Defendant Martin.

10. The normal working hours at GM were 7:30 a.m. to 4:30 p.m.  *Doc. 51* at 3, ¶ 12.

However, Defendants allowed Plaintiff some flexibility in his schedule.  *Id.*  For

example, he was permitted to come in later in the morning if he worked into the

evening, or vice versa.  *Id.*

11. During this time, Plaintiff informed the executive team whenever he needed to

leave for a medical appointment with his wife, and he let them know when he

would return.  *Doc. 51* at 5, ¶ 22-23; Ex. A at 53-56.

12. Plaintiff had not requested FMLA leave for the birth of his first child, in May

2012.  *Doc. 51* at 2, ¶ 9.  However, Plaintiff was not yet eligible for FMLA leave at

that time.  *Doc. 55* at 2, ¶ 9; *see also doc. 51*, Ex. A-10 ("In order to be entitled to

FMLA leave, an employee must have been employed by the employer for 12

months . . . .").

13. GM employees are entitled to 18 days of paid time off (PTO) per annum.  *Doc. 51*

at 2, ¶ 7.  GM's FMLA policy requires employees who take FMLA leave to first

exhaust their PTO.  *Id* at 2, ¶ 5.  Thus, the first portion of their FMLA leave will

be paid leave, and, once the employee's PTO is exhausted, the remainder of their

FMLA leave will be unpaid leave.  *Id.* at 2, ¶ 5-6.

14. Plaintiff never submitted a request for PTO after September 2013, although he

still had seven remaining days off for that year.  *Id.* at 2, ¶ 11; *doc. 55* at 2, ¶ 11.

15. At all times relevant to Plaintiff's claims, GM's Human Resources (HR) Manager was Don Francisco Trujillo. *Doc. 51* at 1, ¶ 3.  His job duties included processing employee requests for Family Medical Leave Act (FMLA) leave. *Id.*; *doc. 57*, Ex. E ¶ 1.  Plaintiff was Mr. Trujillo's direct supervisor. *Doc. 57*, Ex. E ¶ 1.

16. At some point, Plaintiff's wife's condition became more serious. *Doc. 55* at 11, ¶ 5.  On about December 3, 2015, he spoke with Defendant Martin about his need to take intermittent leave. *Id.*

17. On December 6, 2013, Plaintiff left work during a staff meeting to care for his wife, at some time between 4:58 p.m. and 5:21 p.m. *Doc. 55* at 11, ¶ 7; Ex. 4 at 66:9-20.

18. On December 9, 2013, Plaintiff arrived at work late because he was taking care of his wife that morning. *Doc. 55* at 11, ¶ 7.

19. On December 9, 2013, Defendant Martin sent an email to another employee, David Petty, to which she attached an "employee map" that reflected that Plaintiff would no longer be employed at GM. *Doc. 51* at 5, ¶ 28; *doc. 55* at 7, ¶ 28.  Her email advised that she planned to lay off Plaintiff. *Id.*

20. Although the employee map was dated December 4, 2013, the properties log reflected that the document was last modified it on December 9, 2013 at 3:47 p.m. *Doc. 55* at 7, ¶ 28; Ex. 12 at 4.

21. The employee map reflected that Plaintiff was the only executive officer to be terminated effective immediately.  *Doc. 51*, Ex. C-31; *doc. 55* at 7, ¶ 28, Ex. 12 at 4, *doc. 57* at 5, ¶ 28.  However, the employee map also reflected that Ms. Williams would only retain her position as Director of Finance through February 2014.  *Id.*

22. Defendant Martin did not "sen[d] any kind of e-mails to anyone prior to December 9th indicating that Mr. Miera's employment with GM would be separated," and "the attachment [to the December 9, 2013 email was] the first budget documented that indicates that Mr. Miera will no longer be employed with the company."  *Doc. 55*, Ex. 4 at 83:1-6, 87:13-18.

23. Plaintiff met with Defendant Martin on the morning of December 11, 2013, between 8:30 a.m. and 11:45 a.m.  *Doc. 51* at 6, ¶ 31.  He informed her that he would be filing a formal written notice for leave with HR.  *Id.*

24. Later that same day, at approximately 11:45 a.m., Plaintiff delivered a confidential letter to Mr. Trujillo both by hand and by email.  *Doc. 51* at 6, ¶ 32. The letter was titled "Notice of Anticipated FMLA Leave," and stated that he anticipated taking one to two weeks off from work after the birth of his son.  The letter also stated that Plaintiff would need intermittent leave from that date until up to three months after his son was born.  *Id.*

25. Mr. Trujillo was not in his office at the time the letter was hand delivered or the email was sent. *Id.* at 6, ¶ 33.  He was in a meeting with Defendant Martin, who was informing him that Plaintiff would be let go that day. *Id.*

26. Defendant Martin fired Plaintiff on the afternoon of December 11, 2013. *Doc. 55* at 6, ¶ 26.  Defendant Martin presented a letter to Plaintiff stating that his employment was terminated "effective immediately" "[d]ue to a reduction in force." *Doc. 55*, Ex. 11.

27. Mr. Trujillo did not show Plaintiff's FMLA letter to Defendant Martin. *Doc. 51* at 7, ¶ 34.  Plaintiff never sent his FMLA email or correspondence to Defendant Martin, and he does not know whether she saw the email or correspondence before she terminated him. *Id.* at 7, ¶ 35.

28. Prior to his termination, Plaintiff had not "received any kind of write-up for any performance-based issues," *doc. 55*, Ex. 4 at 23:3-6, nor had he "received any formal discipline from Martin or anyone else," *doc. 55*, Ex. 6 ¶ 5. *See also doc. 55* at 13, ¶ 15.

29. From April 2012 to April 2015, GM reduced its personnel from 189 to 20 employees. *Doc. 51* at 8, ¶ 45; *doc. 57*, Ex. E ¶ 10.

30. GM took additional cost-cutting actions at the end of 2013, including discontinuing its Hartford Life disability insurance and its life insurance program with UNUM Life Insurance Company. *Doc. 51* at 8, ¶ 44; Ex. D at 4.

IV.   ANALYSIS

Plaintiff contends that the true reason he was terminated was because of his request for FMLA leave, and not due to a reduction in force or any cost-cutting measures taken at GM.  He raises three separate claims: (1) FMLA retaliation, (2) FMLA interference, and (3) retaliatory discharge under New Mexico law.

A.  **FMLA**

There are two distinct theories of recovery under the FMLA: an interference claim under 29 U.S.C. § 2615(a)(1), and a retaliation claim under  29 U.S.C. § 2615(a)(2). *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).  The Court will consider each in turn.

1.  *FMLA Retaliation*

Plaintiff claims that Defendants retaliated against him for attempting to take FMLA leave by terminating his employment.  29 U.S.C. § 2615(a)(2) makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual" for exercising his rights under the FMLA.

Retaliation claims are analyzed by employing the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Metzler*, 464 F.3d at 1170. Under this analysis, the plaintiff carries the initial burden of establishing a prima facie case.  *McDonnell Douglas*, 411 U.S. at 802.  Next, the burden shifts to the employer to articulate a legitimate, lawful reason for the adverse employment action.  *Id.*  At the

final step, the plaintiff must "be afforded a fair opportunity to show that [employer's] stated reason for [the adverse employment action] was in fact pretext." *Id.* at 804.

To state a prima facie claim of retaliation under the FMLA, Plaintiff must show that: (1) he "engaged in a protected activity," i.e. the exercise or attempted exercise of FMLA leave; (2) the employer "took an action that a reasonable employee would have found materially adverse"; and (3) a "causal connection [exists] between the protected activity and the adverse action." *Metzler*, 464 F.3d at 1171.

Plaintiff clearly meets the first two elements. It is undisputed that he was attempting to exercise his right to FMLA leave and that Defendants terminated his employment. *See id.* (finding first two elements "clearly met" where employee took FMLA leave and was subsequently terminated). With respect to the third element, Plaintiff presents evidence of temporal proximity, which is "relevant evidence of a causal connection sufficient to justify an inference of retaliatory motive." *Id.* (internal quotations omitted). Specifically, the undisputed facts reflect that Plaintiff was terminated eight days after discussing his need for intermittent leave and on the same day that he informed Defendant Martin of his intent to make a formal written request for FMLA leave with HR. This evidence is sufficient to sustain a prima facie case of retaliation.

In any event, Defendants assume that Plaintiff has made a prima facie case for FMLA retaliation for purposes of the instant motion. *Doc. 51* at 10. They instead argue

that summary judgment is nevertheless justified because they had a legitimate, non-retaliatory reason for terminating Plaintiff, and because Plaintiff is unable to establish that the reason was pretextual.  Defendants argue that they terminated Plaintiff "due to financial and budgetary reasons and a reduction in force."  *Id.; see also doc. 51*, Ex. 11. Having provided a reason for Plaintiff's termination that is "not facially prohibited," the burden shifts back to Plaintiff to establish pretext.  *Metzler*, 464 F.3d at 1172.

> **a) There is a material dispute as to whether Defendants' reasons for firing Plaintiff were pretextual.**

"To defeat summary judgment, [Plaintiff] must show that there is a genuine dispute of material fact as to whether [Defendants'] explanations for terminating [his] employment are pretextual."  *Id.*  Pretext may be shown by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted . . . reasons."  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotations omitted).  However, "mere conjecture that the employer's explanation is a pretext . . . is an insufficient basis for denial of summary judgment."  *Id.*

"Evidence of pretext may include, but is not limited to, prior treatment of the plaintiff, disturbing procedural irregularities, and the use of subjective criteria."  *Burris v. Novartis Animal Health U.S., Inc.*, 309 F. App'x 241, 244 (10th Cir. 2009).  Although temporal proximity is also a relevant factor, it is insufficient alone to establish pretext,

no matter how close in time to the adverse employment action.  *Metzler*, 464 F.3d at

1172.  Ordinarily, "[t]o raise a fact issue of pretext, [Plaintiff] must therefore present

evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive."  *Id.*

(emphasis in original).

Plaintiff has come forward with evidence on both requirements.  First, there is a

close temporal proximity between his notifications (on December 3 and December 11)

that he would need intermittent leave due to his wife's medical issues, and his

termination on December 11, 2013.  Second, Defendant Martin's disparaging comments

regarding Plaintiff's need for such leave are circumstantial evidence of retaliatory

motive.

However, as noted above, Defendants justify Plaintiff's termination on the basis

of a significant reduction in force.  Where there has been a reduction in force, "a

plaintiff can demonstrate pretext in three principal ways": (1) by showing that the

reduction in force is itself pretextual, (2) by establishing that the plaintiff's "own

termination does not accord with the RIF criteria supposedly employed," or (3) by

presenting "evidence that [the plaintiff's] evaluation under the RIF criteria was

deliberately falsified or manipulated so as to effect [his] termination."  *Beaird v. Seagate*

*Tech., Inc.*, 145 F.3d 1159, 1168 (10th Cir. 1998).

Under the first category, pretext may be shown in an RIF case by presenting

"evidence that the RIF is more generally pretextual," such as when "an employer

actively sought to replace a number of RIF-terminated employees with new hires." *Id.*

Plaintiff argues that the RIF was pretextual because "[t]here was evidence to show that

GM was spending" around the time he was fired. *Doc. 55* at 17.  For example,

Defendants hired an inexperienced individual, John Hickey, at a salary of $35,000 per

year. *Doc. 55*, Ex. 6 ¶ 13.  Defendants also spent additional funds to replace one

employee and to increase another employee's salary. *Id.* at 17-18.  Finally, Plaintiff

notes that no other executive officers were terminated, but instead "voluntarily

resigned." *Id.* at 9, ¶ 42 (emphasis removed).

The Court finds little merit to this argument.  Even accepting all of Plaintiff's

statements as true, the key piece of evidence is that GM's workforce declined drastically

in size.  Whether due to active layoffs or attrition, the company reduced its workforce

by nearly a factor of 10 over the course of three years—from almost 200 employees to

only 20. *Doc. 51* at 8, ¶ 45; *doc. 57*, Ex. E ¶ 10.  The sheer scale of this reduction is

sufficient to show that the company was in dramatic financial difficulty.  The fact that

GM hired one new employee does not in itself establish that the reduction in force was

pretextual.  "'[O]ur role [as the Court] is to prevent unlawful hiring practices, not to act

as a 'super personnel department' that second guesses employers' business

judgments.'"  *Dalpiaz v. Carbon Cnty., Utah*, 760 F.3d 1126, 1133 (10th Cir. 2014) (quoting

*Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1233 (10th Cir. 2000)).  This new

employee was hired at a salary far lower than Plaintiff's, and GM could well have

determined that it was financially expedient to terminate employees in higher paying jobs while replacing them with less expensive employees.

Although the Court finds that the overall reduction in force was not pretextual, that alone does not end the inquiry.[3]  Plaintiff may also demonstrate that Defendants' RIF reasoning was pretextual by (1) "argu[ing] that [his] own termination does not accord with the RIF criteria supposedly employed," or (2) presenting "evidence that [his] evaluation under the defendant's RIF criteria was deliberately falsified or manipulated so as to effect [his] termination."  *Beaird*, 145 F.3d at 1168.

It is within these categories that Plaintiff prevails for the purposes of the instant motion.  *But see id*. at 1168, n.6 ("We do not foreclose other methods of demonstrating pretext.  Most plaintiffs' arguments, however, will fit within the typology discussed below.").  These categories laid out by the *Beaird* court contain an implicit assumption— that the reduction in force was governed by some objective criteria.  *Cf. Wells v. EMF Corp*., 757 F. Supp.2d 791, 803-04 (N.D. Ind. 2010).  Here, Defendants point to no such criteria.  In fact, Plaintiff's selection for removal in the ongoing reduction in force seemed to have been entirely at the discretion of Defendant Martin.

---

[3] Nonetheless, the Court's rejection of the argument that the overall reduction in force was pretextual is significant for the purposes of damages should Plaintiff prevail on liability.  Even if a jury concludes that Plaintiff's termination on December 11, 2013, was retaliation for or interference with Plaintiff's exercise of FMLA rights, it may find that he would have been terminated anyway in the subsequent months due to the severe reduction in force.  Such a finding would limit Plaintiff's compensatory damages to those suffered prior to the date he would have been terminated absent the improper purpose.

Moreover, Plaintiff presents evidence to discredit Defendants' claim that he was terminated on December 11, 2013, because of the reduction in force. Plaintiff notes that there was no evidence his position would be eliminated prior to Defendant Martin's December 9, 2013 email, and, at that time, Plaintiff was the only executive officer to be terminated effective immediately. This distinctive treatment is a factor, albeit minor, that the Court may consider in evaluating pretext. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (a plaintiff may show pretext by "providing evidence that he was treated differently from other similarly-situated employees").

Most significant, given the lack of criteria beyond Defendant Martin's discretion, are her alleged comments when Plaintiff notified her of his intent to take leave. *Sabourin v. Univ. of Utah*, 676 F.3d 950, 960 (10th Cir. 2012) ("expressions of anger in response to protected activity . . . could . . . be persuasive evidence" in support of FMLA claims). Defendants contend that, "[e]ven assuming the substance of the comments as described by Plaintiff, Ms. Martin never stated that she did not approve of Plaintiff's need to take intermittent time off to assist his wife *because* he needed to take care of his family . . . ." *Doc. 57* at 4 (emphasis in original). Rather, Defendants argue, "she was plainly unhappy that Plaintiff was leaving the office, coming in late and not focusing on his work." *Id.* at 5.

The Court disagrees that any reasonable jury must conclude that Defendant Martin made the alleged comments because she was displeased with Plaintiff's work

product.  It is undisputed that Plaintiff had never received any formal discipline or write-ups for performance problems.  Although Defendants point to the letter Plaintiff sent to Defendant Martin in February 2012 as evidence that there were issues with Plaintiff's performance, the circumstances surrounding this letter are unclear.  Plaintiff also remained at GM for almost two years after this letter was sent and was in fact moved into a position with more responsibility.  Moreover, Plaintiff was explicitly informed that he was terminated "[d]ue to a reduction in force"—not due to problems with his work performance.  Finally, Defendant Martin's alleged comments were plainly directed at the *reason* Plaintiff was requesting leave.  For example, Plaintiff claims that she stated he "should not have to attend to his wife's or unborn baby's concerns," and commented that "times [had] changed," because, in the past, men came back to work "the next morning" after their child was born.  *Doc. 1*, Ex. B ¶¶ 13.  If a jury were to accept Defendant Martin's comments as Plaintiff describes them, it could find them a demonstration of hostility towards Plaintiff's exercise of his FMLA rights and circumstantial evidence of retaliatory intent.

    *Sabourin v. University of Utah* is particularly informative.  676 F.3d 950 (10th Cir. 2012).  In that case, the employer initially decided to eliminate the plaintiff's position due to a reduction in force.  Like Plaintiff, Mr. Sabourin claimed that this reason was pretextual and argued that his employer chose to terminate him in retaliation for requesting FMLA leave.  Mr. Sabourin presented evidence that, when he first discussed

the matter of taking leave with his supervisor, Ms. Shaub, she was "obviously annoyed" and "blew up" at him. *Id.* at 954. Despite the supervisor's angry comments, the Tenth Circuit affirmed summary judgment for defendants.

While there are significant similarities between *Sabourin* and the instant case, there is one critical difference. In that case, the Tenth Circuit concluded that there was "no genuine issue that the reduction in force was wholly independent of Mr. Sabourin's request for FMLA leave," because the employer had decided to fire Mr. Sabourin *before* he ever requested leave. *Id.* at 959. In fact, Mr. Sabourin's supervisor had written a letter dated May 31, 2006, that specifically stated that Mr. Sabourin's position would be eliminated. Mr. Sabourin had not requested leave until almost a week later, on June 5, 2006. *Id.* at 954. In contrast, there is no clear indication in the instant case that Defendant Martin decided to fire Plaintiff before learning of his request for FMLA leave. To the contrary, the first written indication that Plaintiff would be fired was on December 9, 2013, approximately one week *after* Plaintiff's December 3, 2013 conversation with Defendant Martin about taking leave.

For the foregoing reasons, the Court holds that there is a genuine material dispute as to whether Defendants' reasons for firing Plaintiff were pretextual. Summary judgment on Plaintiff's FMLA retaliation claim is, therefore, DENIED.[4]

---

[4] Plaintiff argues in the alternative that the comments allegedly made by Defendant Martin constitute *direct* evidence of retaliatory animus, and thus the burden-shifting analysis of *McDonnell Douglas* does not apply. *See Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1475 (10th Cir. 1996). Direct evidence is

V.   **FMLA Interference**

Plaintiff next claims that, by terminating him, Defendants interfered with his

right to take FMLA leave.  29 U.S.C. § 2615(a)(1) makes it "unlawful for any employer to

interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's

right to FMLA leave.  The burden-shifting analysis of *McDonnell Douglas* does not apply

to interference claims.  Rather, to establish an interference claim under the FMLA, a

plaintiff must demonstrate that (1) he was entitled to FMLA leave, (2) the employer

took some adverse action that interfered with the plaintiff's right to take FMLA leave,

and (3) the employer's action was related to the exercise or attempted exercise of FMLA

rights.  *Metzler*, 464 F.3d at 1180.  Unlike in the retaliation analysis, the employer's intent

is irrelevant to an interference claim.  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877

(10th Cir. 2004).

When the alleged interference is dismissal, an employer can defend the

interference claim by showing that "the dismissal would have occurred regardless of

the employee's request for or taking of FMLA leave."  *Been v. N.M. Dep't of Information

Tech.*, 815 F. Supp. 2d 1222, 1239 (D.N.M. 2011) (quoting *DeFreitas*, 577 F.3d at 1160).

"[T]he burden of persuasion [falls] on the employer to prove that defense."  *Sabourin*,

676 F.3d at 962.

---

"[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without
inference or presumption."  BLACK'S LAW DICTIONARY (10th ed. 2014).  The Court concludes that
Defendant Martin's comments are not direct evidence because they do not, without an inference,
establish that Plaintiff was fired for requesting FMLA leave.

Defendants argue that a mere "indirect causal link" between an employee's dismissal and his request for FMLA leave is "insufficient to support a theory of interference." *Dalpiaz*, 760 F.3d at 1134.  Thus, "assuming Plaintiff argues that his failure to get his work done was related to his wife's pregnancy, the same condition giving rise to his request for anticipated FMLA leave, Plaintiff may still be terminated based on his work performance problems . . . ." *Doc. 51* at 16.  Although Defendants correctly cite the law, the Court has already concluded that there are genuine disputes of fact regarding the legitimacy of Defendants' claim that Plaintiff was terminated for performance reasons.  Consequently, this argument has little merit.

Defendants' remaining argument is that Plaintiff cannot sustain an FMLA interference claim because he would have been dismissed due to the reduction in force regardless of his request for FMLA leave.  Specifically, they argue that the decision to make reductions in force, like the decision to terminate the plaintiff in *Sabourin*, was made prior to Plaintiff's request for leave.  *Doc. 51* at 17.  As noted above, the instant case is readily distinguishable from *Sabourin*.  Although it is undisputed that GM was already undergoing a reduction in force at the time Plaintiff requested leave, it is not undisputed that Defendants had already decided to terminate *Plaintiff*.  In *Sabourin*, on the other hand, the plaintiff's supervisor had expressly stated that she "intend[ed] to eliminate the position of Program Manager," and "[t]he employee to be affected by this action is Mike Sabourin."  676 F.3d at 959.

The Court finds that Plaintiff has presented evidence sufficient to raise a genuine issue of material fact as to whether he would have been fired on December 11, 2013, due to a reduction in force.  As set forth above, Defendants did not use any type of objective criteria for their reduction in force and Plaintiff was also the only executive employee terminated effective immediately at the time he was fired.  Coupled with the alleged comments by Defendant Martin, "a genuine issue of fact exists" because "a reasonable jury could reject [Defendants'] assertion" that Plaintiff would have been fired due to the reduction in force independent of his request for leave.  *Been*, 815 F. Supp. 2d at 1240. Defendants' Motion for Summary Judgment as to Plaintiff's FMLA interference claim is therefore denied.

### A. <u>State Law Retaliatory Discharge</u>

Finally, Plaintiff claims that he was unlawfully discharged by Defendant GM under New Mexico state law for trying to exercise his FMLA rights.  Retaliatory discharge functions as a "narrow exception to the rule that an at-will employee may be discharged with or without cause." *Shovelin v. Cent. N.M. Elec. Co-op, Inc.*, 850 P.2d 996, 1006 (N.M 1993).  To state a claim of retaliatory discharge, Plaintiff must establish: (1) that he "acted to further an end that public policy encourages," (2) that Defendants "knew of or suspected the . . . action suspected," and (3) that Plaintiff's "action was a motivating factor in the employer's decision to discharge him." *Rubio v. McAnally Enter., LLC*, 374 F. Supp. 2d 1052, 1054 (D.N.M. 2005).

Defendants assume for purposes of their Motion for Summary Judgment that Plaintiff has established the first two elements of this claim, but, for the same reasons they challenge Plaintiff's FMLA claims, Defendants urge that Plaintiff cannot prove a causal connection between his actions and the alleged retaliatory discharge.

In their motion, Defendants focus on the fact that "[t]he key to a retaliation case . . . is actual motive." *Doc. 51* at 19 (quotation omitted).  They argue that Plaintiff "cannot establish by a preponderance of the evidence that GM's decision to discharge him was motivated by his verbally advising Ms. Martin or GM of his intent to assert his FMLA rights . . . ." *Doc. 51* at 18.  In particular, there was no intent to discriminate against Plaintiff because (1) Defendants had always permitted Plaintiff to take leave as needed, and (2) Defendants were never placed on notice that Plaintiff planned to take FMLA leave.

With respect to the first argument, Defendants claim that there was no intent to retaliate against Plaintiff for requesting leave because all of his prior requests for leave had been approved.  They also state that Plaintiff was never reprimanded for accommodating his schedule to care for his wife, and PTO leave was never deducted from Plaintiff's leave bank.  While these facts may be true, they are not enough to abrogate, as a matter of law, Plaintiff's evidence of retaliatory intent.  As discussed above, Defendant Martin's alleged comments serve as evidence that she was displeased Plaintiff was taking time off work and that she disapproved of his reasons for doing so.

24

The argument that Defendants were not on notice fails as well.  Defendants state that they did not know that Plaintiff intended to request FMLA leave because he did not take leave for the birth of his first child and he never used the acronym FMLA.

"The employer's duties under the FMLA are triggered so long as 'the employer is on notice that the employee might qualify for FMLA benefits.'"  *Been*, 815 F. Supp. 2d at 1241 (quoting *Tate, Inc.*, 268 F.3d at 997).  Very little is required to put an employer on notice.  In fact, "[a]n employee need not expressly assert rights under the FMLA or even mention the FMLA."  *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 997 (10th Cir. 2001).  In *Been v. N.M. Department of Information Technology*, for example, this Court concluded that the defendants "were on notice that Plaintiff might qualify for FMLA benefits when she first told them she was pregnant . . . ."  815 F. Supp. 2d at 1241.  Here, Defendants do not dispute that they were aware Plaintiff's wife was pregnant.  Further, they do not contest Plaintiff's claim that, "[o]n or about December 3, 2013, . . . [he] advised [Defendants] that he would need additional time away from work to tend to [his wife's] prenatal issues on an intermittent basis."  *Doc. 55* at 11, ¶ 5.  In light of the foregoing, the Court concludes that, at the time of Plaintiff's termination, Defendants had adequate notice that Plaintiff might qualify for FMLA benefits.

For the foregoing reasons, Plaintiff has established that there is a material dispute of fact regarding the causal connection between his request for FMLA leave and his

alleged retaliatory discharge.  Defendants' Motion for Summary Judgment is therefore denied as to this claim.

### B.  Punitive Damages

Defendants also move for summary judgment on Plaintiff's request for punitive damages on his retaliatory discharge claim, arguing that "there are no facts and no evidence that Ms. Martin or GM or any other employee of GM acted with the requisite degree of culpability to justify punitive damages."  *Doc. 51* at 21.

 "[P]unitive damages are allowable in all retaliatory discharge cases."  *Rhein v. ADT Automotive, Inc.*, 930 P.2d 783, 791 (N.M. 1996).  They may be awarded if a defendant had a culpable mental state and their conduct was malicious, willful, reckless, wanton, fraudulent, or in bad faith.  *Clay v. Ferrellgas, Inc.*, 881 P.2d 11, 14 (N.M. 1994); NMRA, Civ. UJI 13-1827 (2015).  Punitive damages are meant "to punish the wrongdoer and to deter the wrongdoer and others in a similar position from such misconduct in the future."  *Rhein*, 930 P.2d at 791 (quoting *Conant v. Rodriguez*, 828 P.2d 425, 429 (N.M. Ct. App. 1992)).

Under New Mexico law, "punitive damages can properly be awarded against a master or other principal because of an act by an agent if . . . the agent was employed in a managerial capacity and was acting in the scope of employment."  *Rhein*, 930 P.2d at 791 (internal quotation omitted).  It is undisputed that Defendant Martin had managerial authority at GM and was authorized to terminate Plaintiff's decision.  Thus,

punitive damages for Plaintiff's retaliatory discharge claim may be awarded against Defendant GM.

Having concluded that there are genuine material facts in dispute as to whether Plaintiff was fired because of his attempt to take FMLA leave, the Court holds that there remain genuine questions of material fact as to whether Defendants acted with the culpable state of mind sufficient to warrant the award of punitive damages.  The Court will therefore deny Defendants' Motion for Summary Judgment on Plaintiff's claim for punitive damages.

VI.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (*docs. 50, 51*) is DENIED.

IT IS SO ORDERED.

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by consent**